UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KAITLYNN MUELLER,

   Plaintiff,

v.

SCANSOURCE, INC.,
INTELISYS, INC.,

   Defendants.

File No.

Hon.

# COMPLAINT AND JURY DEMAND

### COMPLAINT

Plaintiff Kaitlynn Mueller, by her attorneys, Pinsky Smith, PC, states as follows:

### Jurisdiction, Parties, and Venue

1. This is an action requesting the Court to remedy violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and factually related violations of the Elliott-Larsen Civil Rights Act ("ELCRA"), MCL § 37.2101, *et seq.*

2. In violation of these state and federal statutes, Defendants discriminated against and treated Plaintiff differently on account of her sex and pregnancy.

3. This Court has jurisdiction over this Complaint under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. §§ 1331 and 1367.

4. Plaintiff is a resident of Kent County, Michigan, and the Western District of Michigan, Southern Division. At all times relevant to this Complaint, Plaintiff was Defendants' employee as recognized under the statutes under which this Complaint is brought.

5. Defendant Intelisys is a subsidiary of Defendant ScanSource, Inc. It is a technology distributor with a portfolio of over 200 different providers to supply a broad range of communication services to a global base of customers. Headquartered in South Carolina, it employs remote workers and does business throughout the country, including the Midwest, where it hired Ms. Mueller to develop business.

6. Defendant ScanSource, Inc. is currently headquartered in South Carolina, but its operations were primarily located in California at all times relevant to this Complaint. It also employs remote workers and does business throughout the country, including the Midwest.

7. Intelisys, as a self-identified "ScanSource Company," is significantly integrated with ScanSource, with ScanSource retaining a high-level of control over Intelisys. The two companies have many shared operations and departments,

including their Human resources Department.

8. Defendants are employers as recognized under Title VII and ELCRA.

9. Venue is proper within this judicial district under 28 USC §1391.

## Statement of Facts

10. Defendants hired Ms. Mueller as a business development manager for the Midwest region in April of 2022.

11. Ms. Mueller's job was to recruit sales partners across her territory, which included Michigan, Ohio, Pennsylvania, and West Virginia.

12. The majority of Ms. Mueller's focus was based in Ohio.

13. While employed by Defendants, Plaintiff performed her duties in an entirely satisfactory manner. Plaintiff had virtually a spotless record and consistently received positive reviews that she met/exceeded all standards Defendants set for her.

14. Several weeks into her new role with Defendants, in late April or early May, Ms. Mueller received a notice from a former employer, 123Net, indicating that it believed her employment with Intelisys violated a non-compete agreement (the "Non-Compete Agreement") she had with the former employer.

15. Ms. Mueller disagreed that her new employment violated the Non-Compete Agreement in any way. Nevertheless, Ms. Mueller contacted an attorney to assist her in navigating the issue.

16. Ms. Mueller had already disclosed the existence of this Non-Compete Agreement in her application materials prior to Defendants hiring her.

17. During the hiring process and subsequent onboarding, Defendants did not ask for a copy of the Non-Compete Agreement or indicate any concern about whether it applied to Ms. Mueller's employment with Intelisys.

18. When 123Net raised concern that Ms. Mueller's employment violated the Non-Compete Agreement, Ms. Mueller brought the issue to Intelisys multiple times, offering them involvement (and even requesting it) in the process to resolve the issue with 123Net.

19. Intelisys management never indicated any concern or interest in the issue, despite having full knowledge of the situation, until months later—when Ms. Mueller disclosed her pregnancy.

A. The Non-Compete Agreement

20. Upon information and belief, noncompete agreements are standard in Defendants' industry.

21. Prior to her employment with Intelisys, Ms. Mueller worked for 123Net, a small company that directly provided telecommunication services directly to customers. At the time relevant to the Complaint, 123Net only provided four services: fiber and fixed wireless, hosted voice, and colocation/data center services, and it did so only in Michigan.

22. Ms. Mueller separated with 123Net on March 25, 2022, triggering her non-compete obligations with the company.

23. This non-compete prohibited Ms. Mueller from "engaging in any business . . . with a Competitor Business" for six months following her separation from the 123Net.

24. This six-month period ended September 25, 2022.

25. Ms. Mueller subsequently accepted employment with Defendants, which unlike 123Net, are not direct providers. Intelisys is a distributor, and it partners with over 200 providers offering an extensive array of services to a global base of customers, far beyond Michigan.

26. Due to the differences in their businesses, Ms. Mueller never considered Intelisys a "Competitor Business" with 123Net, and she was surprised that 123Net concluded differently.

**B. Ms. Mueller's Plan to Amend the Non-Compete Agreement—Known and Approved by Intelisys**

27. Within a few weeks of receiving notice from 123Net that it considered Intelisys a "Competitor Business," during a business trip to a trade show in Las Vegas on April 12, 2022, Ms. Mueller shared with Regional VP of Sales Bob Farbak and Director of Sales Greg Birch the notice she had received from 123Net, hoping to obtain direction from them on how to handle the situation.

28. She also informed them she had already been in contact with an attorney, and she intended to negotiate a resolution with 123Net, as she did not believe her position with Intelisys conflicted with her obligations to 123Net anyway.

29. Because Ms. Mueller did not believe her employment with Intelisys overlapped with 123Net business and that she could easily perform her new role from Intelisys without an issue for 123Net, she believed working with 123Net to clarify her role with Intelisys would resolve the alleged Non-Compete Agreement issue without causing any harm to Intelisys or her ability to perform her role for Defendants.

30. Neither Mr. Farbak nor Mr. Birch offered any guidance as Ms. Mueller had hoped they would, but they indicated they supported her plan.

31. Neither Mr. Farbak or Mr. Birch indicated any concern at this point either, and they reassured Ms. Mueller that issues like this arise from time to time, because non-competes are so common, and that it was unlikely to be a problem.

32. Neither Mr. Farbak or Mr. Birch asked for a copy of Ms. Mueller's non-compete agreement with 123Net, nor did they ask to be involved or obtain a copy of anything she renegotiated with 123Net.

33. Subsequently, Ms. Mueller negotiated an Amendment to the Non-Compete Agreement (the "Amendment"). The Amendment confirmed her ability to work for Intelisys, if she agreed 1) not to pursue any business with existing 123Net Customers if they reached out to her; and 2) not to take business, employees, or suppliers from 123Net.

34. The Amendment continued the original timeframes. Since this was an amendment to the "competitor business" portion of the Non-Compete, which only

applied until September 25, 2022, the clarified limitations also applied until September 25, 2022.

35. Prior to signing the Amendment, Ms. Mueller again raised the Non-Compete Agreement issue with Mr. Birch during a business trip in Michigan.

36. She informed him she was in the final stages of negotiating the Amendment, and she walked him through the terms of it.

37. Mr. Birch again didn't indicate any concern, interest in the negotiation, or in receiving a copy of any of the agreements in question.

38. Without hearing any objection or concern from Mr. Birch, Ms. Mueller signed the Amendment June 25, 2022.

39. At no point during the summer of 2022, prior to, during the negotiation of, or after signing the Amendment, did anyone from Intelisys indicate an interest or concern over the substance of the Non-Compete Agreement, the Amendment, or whether anything Ms. Mueller did for Defendants violated either agreement.

### C. Continued Employment—Without any Complications or Issues from the Amendment

40. Ms. Mueller continued working for Intelisys without issue for months after she negotiated the Amendment.

41. As she expected, at no point during the summer of 2022, prior to, during the negotiation of, or after signing the Amendment, was Ms. Mueller limited by the agreement in performing her duties for Defendants in any way.

42. She was never contacted by 123Net Customers, nor was she unable to attend any events for Intelisys or to pursue any business on behalf of Intelisys.

43. She continued having regular one-on-one meetings with Mr. Birch, and at no point did he raise any concerns about her performance or her business efforts.

44. Upon information and belief, Ms. Mueller was performing as well as or better than others business managers in the company.

45. Ms. Mueller was continuously told she was performing well and there was no indication of a problem from either Mr. Birch or Mr. Farbak.

46. In the first week of October, Ms. Mueller went to another work event with Mr. Birch and Mr. Farbak.

47. When they returned, on or around October 7, 2022, Ms. Mueller informed Mr. Farbak that she was pregnant and expecting her first child.

48. Three days later, on October 10, during her weekly one-on-one with Mr. Birch, she shared with him that she was expecting a child as well.

49. Several weeks later, from October 24 until October 26, she and Mr. Birch were on another business trip together.

50. They had a successful dinner with a partner in Ms. Mueller's territory on October 25, 2022. It went so well that Mr. Birch texted Mr. Farbak how proud he was of Ms. Mueller and her performance.

51. The next day, on October 26, 2022, Mr. Birch and Ms. Mueller went home.

52. While driving to the airport, they started talking about Ms. Mueller's travel. Mr. Birch indicated there would be another upcoming trip in November. Ms. Mueller made a joke about yet another trip, given how much travel she'd already done that fall.

53. In response, Mr. Birch retorted that she needed to travel once or twice every month—despite there being no such obligation in her job description or any discussion about such a requirement previously.

54. Mr. Birch then asked Ms. Mueller if she could provide him a list of 123Net providers (which Ms. Mueller objected to ethically, legally, and as a violation of her *non-solicitation provisions* with 123Net—irrespective of her Amendment she had signed with respect to Intelisys as a "Competitor Business." When she declined to provide this, Mr. Birch asked, "whatever came of the non-compete issue with 123Net?" In response, Ms. Mueller reminded Mr. Birch that she had negotiated the Amendment with 123Net back in June. Still, Mr. Birch did not indicate concern about this or ask for a copy of any of the agreements.

55. Shortly after this, for the first time ever, Mr. Birch asked for a copy of the Amendment.

D. **Disparate Treatment, Discrimination, and Termination**

56. Notably, Mr. Birch only requested a copy of the Agreements after Ms. Mueller shared news of her pregnancy and had a sharp discussion with Mr. Birch about his expectations for her travel.

57. Furthermore, he requested copies of these Agreements *after* the six-month prohibition on working for a Competitor Business had already expired on September 25—in both the original Non-Compete Agreement and the Amendment.

58. At this point, the Amendment had not and could not limit Ms. Mueller's performance in any way at that point.

59. Intelisys claimed the Amendment was problematic and required Ms. Mueller's termination, and they were unwilling to even review the agreement to determine that it no longer applied.

60. Prior to her sharing news about her pregnancy, Defendants were aware of both the Non-Compete Agreement and the Amendment, but they had no interest in reviewing whether her non-compete agreement applied to her work for the Company.

61. Indeed, upon information and belief, Defendants are unconcerned about the substance included in any of their employee's non-compete agreements impacting their work.

62. Defendants routinely fail to request copies of these agreements.

63. However, this changed for Ms. Mueller after she shared news of her pregnancy.

64. Upon information and belief, Mr. Birch raised this issue for the first time after Ms. Mueller commented about the travel schedule. Concerned that she may be

unwilling or unable to continue traveling once or twice a month throughout her entire pregnancy and beyond.

65. Suddenly, for the first time, Mr. Birch cared about the substance in the Agreements, and he raised the issue to HR.

66. Upon information and belief, Mr. Birch's compensation is based in part on how Ms. Mueller's territory performs. With her being on maternity leave, Mr. Birch would have to do her work as well as his, to keep his compensation as planned.

67. Furthermore, upon information and belief, Mr. Birch's sexist beliefs about motherhood influenced his conclusions that Ms. Mueller would no longer be willing to travel or perform as well her in territory once she became a mother.

68. Mr. Birch only cared about the substance of her Non-Compete Agreement or the Amendment after he learned of her pregnancy and needed to find a way to terminate her.

69. Upon information and belief, Mr. Birch singled out Ms. Mueller as a pregnant woman, treating her differently and inquiring about her non-compete agreements, when she was performing as well as or better than other business managers on his team and others also have non-compete agreements that arguably could impact their performance for Defendants.

70. Mr. Birch decided to terminate Ms. Mueller based on the discriminatory belief that her pregnancy (and subsequent child) would impact her ability to do her

job for Intelisys—not because her job had somehow been impacted by the Amendment in the previous months.

71. Upon information and belief, Mr. Birch strategically used the existence of the Amendment (which he had known about for months and which he knew had not been an issue with her performance) to convince Intelisys to terminate Ms. Mueller's employment.

72. Worse, Defendants were unwilling to understand it (or the fact that the Amendment already expired), and fired her for the mere existence of the Amendment.

73. Mr. Birch knew about the Non-Compete Agreement and the Amendment, and it was never a problem until he wanted it to be one, and he wanted to use it as pretext to terminate Ms. Mueller for illegal sex and pregnancy discrimination.

74. On or around November 30, 2022, Intelisys terminated Ms. Mueller's employment.

75. Defendants' action harmed Ms. Mueller emotionally, physically, and financially.

<u>Statutory Prerequisite</u>

76. Plaintiff filed a charge of disability discrimination with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the commission of the unlawful employment practice alleged herein.

77. Plaintiff received a Notice of Right to Sue from the EEOC prior to initiating this lawsuit.

78. This action has been filed with 90 days of the receipt of Plaintiff's Notice of Right to Sue.

### COUNT I – Violation of Title VII of the Civil Rights Act of 1964 – Gender Discrimination and Disparate Impact

79. Plaintiff relies on the allegations of all prior paragraphs as if they were restated herein.

80. Defendants violated 42 U.S.C. § 2000e when they discriminated against her, treated her differently than other employees, and ultimately terminated her because of her pregnancy and her sex.

81. Defendants' purported reasons for terminating Plaintiff are pretext for illegal discrimination.

82. As a result, Plaintiff has suffered monetary and other harms.

### Relief

WHEREFORE, Plaintiff requests that the Court grant the following relief:

a) Award Plaintiff damages equal to lost earnings, benefits, and/or other compensation denied or lost to her by reasons of Defendant's illegal conduct, plus interest;

b) Award Plaintiff compensatory damages for mental anguish and emotional distress;

c) Award Plaintiff punitive damages;

    d)    Award Plaintiff's costs and reasonable attorney's fees;

    e)    Issue an order reinstating Plaintiff in an appropriate position; and

    f)    Award Plaintiff other relief as may be just and equitable.

## COUNT II – Violation of the Elliot-Larsen Civil Rights Act – Gender Discrimination and Disparage Impact

83. Plaintiff relies on the allegations of all prior paragraphs as if they were restated herein.

84. Defendants violated ELCRA when they treated her differently, discriminated against her, and ultimately terminated her because of her pregnancy and sex.

85. Defendants violated ELCRA when they treated her differently than other employees because of her pregnancy and her sex.

86. As a result, Plaintiff has suffered monetary and other harms.

### Relief

WHEREFORE, Plaintiff requests that the Court grant the following relief:

    a)    Award Plaintiff damages equal to lost earnings, benefits, and/or other compensation denied or lost to her by reasons of Defendant's illegal conduct, plus interest;

    b)    Award Plaintiff compensatory damages for mental anguish and emotional distress;

    c)    Award Plaintiff punitive damages;

    d)    Award Plaintiff's costs and reasonable attorney's fees;

e) Issue an order reinstating Plaintiff in an appropriate position; and

f) Award Plaintiff other relief as may be just and equitable.

Dated: October 11, 2024          PINSKY SMITH, PC
                                 Attorneys for Plaintiff

                                 By /s/ Crystal J. Bultje
                                     Crystal J. Bultje (P80276)
                                     146 Monroe Center, N.W., Suite 415
                                     Grand Rapids, MI 49503
                                     (616) 451-8496

16 | Page

## JURY DEMAND

To the extent jury trial is allowed with regard to any of the issues herein, Plaintiff demands same.

Dated: October 11, 2024          PINSKY SMITH, PC
                                 Attorneys for Plaintiff

                                 By /s/ Crystal J. Bultje
                                    Crystal J. Bultje (P80276)
                                    146 Monroe Center, N.W., Suite 415
                                    Grand Rapids, MI 49503
                                    (616) 451-8496